## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

U.S. SECURITIES AND EXCHANGE
COMMISSION,

                                    Plaintiff,

          v.

ALAN Z. APPELBAUM,

                                    Defendant.

22-cv-_____  (____)

## COMPLAINT

**ECF CASE**
**JURY TRIAL DEMANDED**

Plaintiff U.S. Securities and Exchange Commission (the "SEC" or "Commission") files

this Complaint against Alan Z. Appelbaum ("Appelbaum") and alleges as follows:

## SUMMARY

1.       Retail investors often rely on the recommendations of broker-dealers and their

associated registered representatives when purchasing or selling securities.[1]  Registered

representatives are required to recommend only securities transactions that are suitable for their

customers,[2] based on each customer's characteristics, including the customer's risk tolerance,

investment time horizons, and financial needs, among other things.  The federal securities laws

---

[1]  A broker is "any person engaged in the business of effecting transactions in securities for the
account of others."  Securities Exchange Act of 1934 ("Exchange Act") Section 3(a)(4)(A) [15
U.S.C § 78c(a)(4)(A)].  A dealer is "any person engaged in the business of buying and selling
securities for his own account, through a broker or otherwise."  Exchange Act Section 3(a)(5)(A)
[15 U.S.C. § 78c(a)(5)(A)].  A registered representative is a person that works for a broker-
dealer, sells securities to customers, and is registered with the Financial Industry Regulatory
Authority ("FINRA"), a government-authorized not-for-profit organization that oversees broker-
dealers.

[2]  A "customer" is an investor who purchases securities (or other goods or services) through a
registered representative.

also prohibit registered representatives from purchasing or selling securities for their customers in non-discretionary accounts[3] without customer authorization.

2.     From at least July 2017 through at least May 2019, Appelbaum – a registered representative of Aegis Capital Corporation ("Aegis"), a New York-based broker-dealer with offices in Florida – disregarded his obligations to his customers and repeatedly violated the antifraud provisions of the federal securities law by making unsuitable recommendations and by engaging in unauthorized trading.

3.     Specifically, from July 2017 to May 2019, Appelbaum made over 140 unsuitable recommendations and purchases of highly complex structured products for seven retail customers.  Unlike conventional debt securities, these variable rate interest structured products ("VRSPs") that Appelbaum recommended and purchased for his customers did not pay a fixed amount of principal at maturity.  Rather, the VRSPs had a complicated structure under which recovery of principal at maturity was contingent upon the operation of derivative features tied to equity indexes, such as the Standard and Poor's 500 ("S&P 500") or the Russell 2000 stock market indexes.  As a result, customers could lose a portion or all of their investment, even if the issuer of the VRSP did not default.

4.     Interest payments to customers owning the VRSPs were also contingent upon the operation of derivative features typically tied to equity indexes, as well as the spreads between long-term and short-term United States bond yield curves.  Although the VRSPs paid a fixed interest rate for an initial period that was typically one to three years, the VRSPs were not

---

[3] A non-discretionary account requires registered representative to obtain permission before buying and selling securities in a customer's account.

guaranteed to pay any interest thereafter and, in fact, sometimes did not pay any monthly or quarterly interest.[4]

5.      The VRSPs, most of which had maturity periods of fifteen years or more, offered no assurance of liquidity and typically sold in the secondary market at a significant discount to the VRSP's "par" value, *i.e.*, the face value of the VRSP.

6.      Despite the risky nature of these securities, Appelbaum recommended VRSPs and purchased them for seven customers who had a "moderate" risk tolerance,[5] were unwilling to lose their entire invested principal, and typically had investment time horizons that were inconsistent with the VRSP maturity dates.  Appelbaum knew, was reckless in not knowing, or should have known that these securities were unsuitable for those customers.

7.      In recommending and purchasing the unsuitable VRSPs, Appelbaum made material misrepresentations and omissions, including by omitting the material fact that the VRSPs were unsuitable to the financial needs and other investor characteristics of these seven customers.  Appelbaum also falsely and misleadingly told multiple customers that the VRSPs would pay off "at par" when the VRSPs reach maturity.  In making these material misstatements,

---

[4] For example, one product sold by Appelbaum guaranteed interest for one year at a rate of 10 percent; however, interest in subsequent years would be paid only for each day that the Russell 2000 Index closed greater than or equal to 70 percent of the initial index reference value.  For this product, the interest rate after the first year was determined based on the difference, if any, between the 30-Year Constant Maturity Swap rate and the 2-Year Constant Maturity Swap rate, multiplied by a leverage factor (subject to a maximum interest rate of 10 percent).  The product did not pay monthly interest if the 2-Year Constant Maturity Swap rate was greater than or equal to the 30-Year Constant Maturity Swap rate at the interest determination date.

[5] The new account forms signed by Aegis customers stated that "moderate risk" meant that the customer was willing to lose "a portion" of his or her investment, not the entire investment (as could happen with a "maximum risk" investment) and not a "substantial portion" of the investment (as could happen with a "high risk" investment).

Appelbaum omitted the material fact that his customers could lose some or all of their principal investment.

8.      From September 2015 through May 2019, Appelbaum also executed hundreds of unauthorized trades in the same seven customers' brokerage accounts without their consent, including trades in VRSPs that were unsuitable for those customers, and even though the accounts were non-discretionary and required customer approval before each trade.  Appelbaum received compensation for the vast majority of the unauthorized and unsuitable trades that he executed,

9.      As a result of these unsuitable and unauthorized VRSP trades, Appelbaum received at least $1 million in compensation.  Some of Appelbaum's customers, by contrast, suffered significant losses, including one customer who lost over $1 million and another who lost over $200,000 as a result of Appelbaum's unsuitable and unauthorized VRSP trades in their accounts.

## **VIOLATIONS**

10.      By virtue of the conduct alleged herein, Appelbaum, directly or indirectly, singly or in concert, violated and is otherwise liable for violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

11.       Unless Appelbaum, who continues to hold licenses allowing him to be employed as a registered representative with a broker-dealer, is permanently restrained and enjoined, he will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object.

## JURISDICTION AND VENUE

12.     The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 2l(d)(l) of the Exchange Act [15 U.S.C. § 78u(d)(l)], seeking a final judgment: (1) restraining and permanently enjoining Appelbaum from engaging in the acts, practices, and courses of business alleged against him herein pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) [15 U.S.C. § 78u(d)(1)] of the Exchange Act; (b) ordering Appelbaum to disgorge all ill-gotten gains and to pay prejudgment interest on those amounts pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(5) and (d)(7)]; and (c) imposing civil money penalties on Appelbaum pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

14.     In connection with the conduct alleged in this Complaint, Appelbaum, directly or indirectly, singly or in concert with others, made use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange, including through Appelbaum's use of telephone communications and the Internet when executing the transactions at issue in this case.

15.     Venue lies in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b)(1) and (2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, and were effected, directly or indirectly,

by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange. Specifically, during the relevant time period, Appelbaum resided in this District and conducted business at an Aegis branch office located in this District.

## DEFENDANT

16.     **Alan Z. Appelbaum,** age 75, resides in Boca Raton, Florida. From July 2015 to May 2021, Appelbaum was employed as a registered representative by Aegis at its branch office in Boca Raton, Florida. In addition to being a registered representative, Appelbaum was a Managing Director of Aegis and headed the firm's Municipal Bond Desk from approximately August 2015 to September 2018, after which time he became co-head of the firm's Fixed Income Desk until his departure from the firm.

17.     Appelbaum has a lengthy disciplinary history in the securities industry. At least 14 of Appelbaum's customers have filed FINRA or National Association of Securities Dealers Association ("NASD")[6] arbitration claims or customer complaints against him. Eleven of the claims and complaints were settled through a payment to the customers and another resulted in an NASD arbitration panel finding Appelbaum liable for, among other things, unsuitable securities trading and ordering him to pay compensatory damages.

18.     Appelbaum has also been the subject of disciplinary actions by the SEC and other regulatory authorities. In February 1982, the SEC censured Appelbaum for aiding and abetting his previous employer's violations of Section 17(a) of the Exchange Act and Exchange Act Rule 17a-3, among other violations. In July 2006, the State of New Hampshire's Bureau of Securities Regulation obtained a cease-and-desist order against Appelbaum and fined him for servicing the

---

[6] The NASD was a predecessor to FINRA.

brokerage accounts of New Hampshire residents while not licensed to sell securities in New

Hampshire.  And in July 1991, the NASD fined and censured Appelbaum for, among other

things, effecting securities transactions while failing to maintain required minimum net capital.

19.     Appelbaum resigned from Aegis in May 2021 for failing to follow the firm's

procedures and for engaging in unauthorized trading.  Appelbaum is not currently registered with

a broker-dealer, but he continues to hold FINRA Series 4, 7, 12, 24, 27, 53, and 63 licenses.

## RELATED ENTITY

20.     **Aegis Capital Corporation** is a New York corporation with its main office in

New York, New York and over 20 branch offices nationwide, including six branch offices in

Florida.  During the relevant time period, Appelbaum worked at an Aegis branch office in Boca

Raton, Florida that Aegis recently closed.  Aegis has been registered with the Commission as a

broker-dealer since 1984 and as an investment adviser since 2010.

## FACTUAL ALLEGATIONS

**Appelbaum Made Customer-Specific
Recommendations That Were Unsuitable**

21.      As a registered representative, Appelbaum was required to make customer-

specific suitability determinations for securities transactions that he recommended.  In particular,

he had a duty to determine that the securities that he recommended to his customers were

suitable for those customers in light of their financial needs, investment objectives, risk

tolerance, investment time horizons, and other circumstances.

22.     This obligation was incorporated into Aegis's Written Supervisory Procedures

("WSPs").  For example, Aegis's WSPs required its registered representatives to comply with the

customer-specific suitability requirements set forth in FINRA Rule 2111.  Under FINRA Rule

2111, registered representatives are required to recommend purchases of securities that are

suitable for the customer, based on the customer's investment profile, which includes the customer's age, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, other investments, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

23.     Appelbaum knew that he was required to make customer-specific suitability determinations and to recommend securities that were suitable for his customers.  In fact, Appelbaum testified that brokers who are not aware of these requirements "don't belong in the business."

24.     Aegis's WSPs also stated that complex products like VRSPs "warrant particular care in how they are scrutinized and sold to customers."  In particular, Aegis's WSPs stated that registered representatives, including Appelbaum, were required to consider the "extent and limitation of any principal protection" of complex products like VRSPs in order to "make suitable recommendations" to customers.

25.     In July 2017, Aegis established firm-wide procedures specific to structured products (the "July 2017 Policy") that limited the sale of structured products, such as VRSPs, to only those customers with "high" or "maximum" risk tolerances.[7]

26.     Appelbaum recommended and purchased VRSPs for seven customers who – as Appelbaum knew, was reckless in not knowing, or should have known – had a "moderate" risk tolerance and who were unwilling to risk losing their entire investment.  These recommendations were unsuitable for these customers because, among other reasons, (1) the VRSPs lacked any

---

[7] The customer's risk tolerances were described in account opening forms signed by the customers.

principal protection at maturity and had complex structures that made recovery of principal at maturity contingent upon the performances of one or more equity indexes; (2) VRSP interest payments after an initial period were typically contingent upon the performance of equity index(es) and the spreads between long-term and short-term United States bond yield curves; and (3) the VRSPs typically had maturity dates inconsistent with the seven customers' investment time horizons and sold in the secondary market at significant discounts.

27.     In addition to making unsuitable recommendations and violating the July 2017 Policy, Appelbaum also failed to comply with other Aegis procedures aimed at ensuring that registered representatives disclosed to customers, and that customers understood the risks of structured products like VRSPs to customers.

28.     Specifically, from at least July 2017 through at least May 2019, Aegis required its registered representatives to provide a "Structured Products Disclosure" form ("Disclosure Form") to each customer when recommending the purchase of structured products such as VRSPs. The Disclosure Form notified customers that structured products offered "no guarantee of any specific return on the principal amount or the repayment of all or a portion of the principal amount" and that such products "may not be liquid." The Disclosure Form also provided a link to a January 2015 SEC "Investor Bulletin" on structured notes such as VRSPs. That investor bulletin stated, among other things, that structured notes "can be very complex and have significant investment risks" and warned that "[b]efore investing in structured notes, you should understand how the notes work and carefully consider their risks." The Disclosure Form further required customers to sign and return the form and to accept the terms and conditions set forth in the form.

29.     After the July 2017 Policy became effective, Appelbaum did not provide the Disclosure Form to any of the seven customers before he started purchasing VRSPs in their accounts.  In fact, Appelbaum did not provide the Forms to any of the customers for nearly two years after Aegis enacted the July 2017 Policy.

30.     Appelbaum also failed to sign a "Structured Product Attestation" forms ("Attestation Forms") for the VRSP purchases for the seven customers during the relevant period, again in violation of Aegis policy.  The Attestation Forms required registered representatives like Appelbaum to attest to, among other things, that the registered representative informed customers of the potential illiquidity and "market risk" of the structured products.

31.     Appelbaum did not comply with Aegis's structured products procedures – including the July 2017 Policy and the policies relating to the Disclosure and Attestation Forms – even though the VRSPs that he recommended and purchased for the seven customers were structured products as defined in Aegis's procedures and all of these procedures therefore applied to them.[8]

32.     Appelbaum further failed to take Aegis's mandatory training regarding the sale of structured products, which warned registered representatives to "not guarantee anything, because markets might not cooperate."

33.     In total, Appelbaum purchased over 140 VRSPs for the seven customers from July 2017 through May 2019.  He knew, was reckless in not knowing, or should have known that these VRSPs were unsuitable for these customers in light of their investment profiles, including

---

[8] As Appelbaum stated in testimony, the VRSPs are "part of the structured products classification."  Aegis's structured products procedures applied to sales of all VRSPs, including those purchased at issuance and those purchased in the secondary market.

their financial needs, risk tolerance, investment time horizons, and other circumstances, as further described below.  The unsuitable VRSPs that Appelbaum recommended, including the Committee on Uniform Securities Identification Procedures ("CUSIP") number for each VRSP at issue, are summarized in **Exhibit 1** to this Complaint.

34.    <u>Customers 1 and 2</u>:  Customers 1 and 2 are trusts owned by a husband and wife, ages 82 and 80[9] respectively.  The husband and wife each had a "moderate" risk tolerance, were unwilling to lose their entire invested principal, and had investment time horizons of 9-11 years. From July 2017 through March 2018, Appelbaum purchased at least 21 VRSPs for Customers 1 and 2, all of which had maturity dates that were 15 years or more from the date of purchase, including VRSP purchases that Appelbaum made without the authorization of Customer 1 and Customer 2.  Appelbaum knew, was reckless in not knowing, or should have known that the VRSPs were unsuitable for Customers 1 and 2 based on their "moderate" risk tolerance, unwillingness to lose their entire invested principal, investment time horizons of 9-11 years that were inconsistent with the VRSPs, and their respective ages.[10]

35.    <u>Customer 3</u>:  Customer 3 is a trust owned by a widow, age 89, with a "moderate" risk tolerance, who was unwilling to lose her entire invested principal, and had a 1-3 year investment time horizon.  From July 2017 through April 2018, Appelbaum purchased at least 16 VRSPs for Customer 3, all of which had maturity dates that were 10 years or more from the date

---

[9] The listed ages are the customers' current ages, not the ages when Appelbaum purchased the VRSPs for the customers.

[10] Customers 1 and 2 filed a FINRA complaint against Appelbaum stating that the VRSPs that he purchased in their accounts were "not suitable" to their financial needs and, along with Appelbaum's practice of "regularly placing trades in [Customer 1's and 2's] accounts without consent," caused them "several hundred thousand dollars" in losses.

of purchase (usually 15 years), including VRSP purchases that he made without Customer 3's authorization.  Appelbaum knew, was reckless in not knowing, or should have known that the VRSPs were unsuitable for Customer 3 based on the Customer 3's "moderate" risk tolerance, her unwillingness to lose her entire invested principal, an investment horizon of 1-3 years that was inconsistent with the VRSPs, and the age of Customer 3's owner.  Customer 3 suffered at least $200,000 in losses as a result of Appelbaum's unsuitable recommendations discussed herein and the unauthorized trading detailed below.[11]

36.    Customers 4 and 5:  Customers 4 and 5 are trusts owned by a husband age 86 and wife age 83.  The husband and wife each had "moderate" risk profiles, were unwilling to lose their entire invested principal, and had a 9-11 year investment horizon.  From at least July 2017 through at least April 2019, Appelbaum purchased at least 56 VRSPs for Customers 4 and 5, all of which had maturity dates that were 15 years or more from the date of purchase, including VRSP purchases that Appelbaum made without Customers 4's and 5's authorization. Appelbaum knew, was reckless in not knowing, or should have known that the VRSPs were unsuitable for Customers 4 and 5 based on their "moderate" risk tolerance, unwillingness to lose their entire invested principal, the age of Customer 4 and 5's owner, and their 9-11 years investment time horizons.

37.    Customer 6:  Customer 6, age 61, had a "moderate" risk profile, was unwilling to lose her entire invested principal, and had an investment horizon of 9-11 years, with a typical investment holding period of 1-3 years.  From July 2017 through June 2018, Appelbaum

_____

[11] Customer 3 filed a FINRA arbitration claim against Appelbaum stating that the VRSPs that Appelbaum purchased were unsuitable in light of her age and risk tolerance, among other reasons.  Customer 3's FINRA complaint was settled through a payment of $280,000 to Customer 3.

purchased at least nine VRSPs for Customer 6, all of which had maturity dates that were 10 years or more from the date of purchase (usually 15 years).  When he made these purchases, Appelbaum knew or was reckless in not knowing that the VRSPs were unsuitable for Customer 6 based on her "moderate" risk tolerance, unwillingness to lose her entire invested principal, and her investment time horizon.

38.     Customer 7:  Customer 7, a single-member LLC owned by a woman age 58, had a "moderate" risk profile and was unwilling to lose the entire invested principal.  From July 2017 through April 2019, Appelbaum purchased at least 44 VRSPs for Customer 7, the majority of which had maturity dates of 15 years or more, including VRSP purchases that he made without Customer 7's authorization.  Appelbaum knew, was reckless in not knowing, or should have known that the VRSPs were unsuitable based on Customer 7's "moderate" risk tolerance and unwillingness to lose her entire invested principal.  Customer 7 suffered at least $1 million in losses as a result of Appelbaum's unsuitable recommendations discussed herein and the unauthorized trading detailed below.[12]

**Appelbaum Made Material Misrepresentations and Omissions
to His Customers Including Material Omissions Regarding Suitability**

39.     Appelbaum made materially false and misleading statements regarding the VRSPs when recommending and purchasing the VRSPs for his customers.

40.     First, Appelbaum knew, was reckless in not knowing, or should have known that the VRSPs were not suitable for the seven customers described above, but he omitted that

---

[12]  Customer 7's owner filed a FINRA arbitration claim against Appelbaum stating that the VRSPs that he purchased were not suitable for Customer 7's financial needs and that Appelbaum had traded in VRSPs in Customer 7's account without authorization.  Customer 7's FINRA arbitration claim was settled through a $1.65 million payment to Customer 7.

material fact when he recommended the VRSPs to those customers and when he purchased

VRSPs in their accounts (often without authorization, as discussed in further detail below).

Among other things, Appelbaum recommended the transactions, but failed to disclose that the

VRSPs were unsuitable for customers with a "moderate" risk tolerance or those who were

unwilling to risk losing their entire invested principal, like the seven customers.

41.    A reasonable investor would have wanted to know that the VRSPs were not

suitable for the seven customers given their financial needs, or would have found that

information important to their investment decision.  In fact, multiple customers have stated that

they would not have invested in VRSPs if they had known that VRSPs were not suitable for their

financial needs, risk tolerance, investment time horizons, and other characteristics.

42.    Appelbaum also made material misrepresentations to certain customers regarding

the VRSPs, knowing that his customers relied upon him for information about the VRSPs, and so

that these customers would not close their accounts, allowing Appelbaum to continue making

VRSP purchases in those accounts.[13]

43.    For example, Appelbaum falsely told the owner of Customer 7 that he was

investing her money in conservative bonds.  Specifically, when investing with Appelbaum,

_____

[13] Appelbaum testified that he did not provide prospectuses to customers for whom he purchased
VRSPs in the secondary market (which made up a significant portion of the unsuitable VRSP
trades at issue).  He further testified that he did not provide prospectuses to customers purchasing
newly issued VRSPs before he made those purchases on their behalf.  Instead, as Appelbaum
testified, his customers "rely [ ] on me."  The prospectuses typically outlined the risks associated
with the VRSPs.  For example, VRSP prospectuses typically stated that the VRSP was a
"principal-at-risk" security and that customers could lose some or all of their invested principal if
certain referenced assets, such as the S&P 500, did not perform above certain pre-determined
ranges at maturity.  Prospectuses also typically expressly warned, "There is no minimum
payment at maturity.  Accordingly, investors may lose up to their entire initial investment in the
securities."  The prospectuses also typically stated that "it is possible you will receive little or no
interest on the securities" after the initial teaser period.

Customer 7's owner advised Appelbaum that she was only interested in conservative investments.  Appelbaum assured Customer 7's owner that he would purchase "boring bonds" so that Customer 7's owner would have "guaranteed income" for her retirement.  Customer 7 wired money to Appelbaum to invest only after Appelbaum provided these assurances.  But instead of buying bonds that would provide guaranteed income for Customer 7, Appelbaum used much of the money to purchase VRSPs, which were not "boring bonds," but rather highly complex structured products that had the potential to lose their entire principal depending on the performance of equity indexes, as well as the potential to not pay interest after an initial period that often depended on the performance of equity indexes and Treasury yield curves. Appelbaum also did not provide Customer 7 with any prospectus that outlined the risks of the VRSPs, particularly the risk that the VRSPs could lose principal and not pay interest.

44.    In December 2018, Customer 7's owner learned that what she believed to be investments in conservative bonds were losing significant market value.  She emailed Appelbaum that her husband had "freaked out" when learning of the losses and asked Appelbaum to confirm how a substantial portion of Customer 7's nearly $12 million investment with Appelbaum had been lost.

45.    On January 19, 2019, Appelbaum responded by falsely stating that "these bonds will pay off at over 12 million" at maturity and "that is not including the interest you will receive during this time."  In fact, a significant portion of Customer 7's $12 million was *not* invested in conservative bonds, but rather in complex and risky VRSPs.  Appelbaum also stated that, given the "destruction of the stock market over the past couple weeks," the bonds he had supposedly purchased for Customer 7 were a particularly good investment, concealing the material fact that

the VRSPs' value – and their payment of interest – was actually linked to the very stock market

that he said was being "destr[oyed]."

46.     Appelbaum also misleadingly stated in that same communication that Customer 7

was guaranteed to receive her principal ("par") at maturity:

> [Customer 7's owner], bonds go up and down, much like stocks.
> Underline But one of the reasons we buy bonds, is eventually they go back to
> par (100). Underline  In other words, in your case back to 12 million+.  That
> isn't the case with stocks.  Bonds will have more good and bad
> years ahead, but [Customer 7's owner's husband] is looking at a
> 'snapshot' in time and yes 2018 was not a good year, but we are
> building something not for today but for your retirement.  And
> even if your retirement starts in the next couple of years, you will
> generate enough income along the way to pay for the retirement as
> well as having your bonds go to over 12 million dollars at maturity

(Emphasis added.)

47.     Appelbaum's statements were false and misleading because the VRSPs were not

guaranteed to go "back to par."  Instead, unlike traditional debt securities like municipal or

corporate bonds, their value at maturity was dependent on one or more stock market indexes.

48.     After Appelbaum made these false and misleading statements in January 2019,

Customer 7 kept a brokerage account with Appelbaum and he continued to purchase unsuitable

VRSPs in Customer 7's account.

49.     In March 2019, Customer 7's owner again emailed Appelbaum to ask about

losses associated with VRSPs.  Appelbaum responded that he was on vacation and that he would

call Customer 7's owner, but he assured her that the losses were "not a significant item."

50.     After Appelbaum made the false and misleading statement that losses in

Customer 7's account was not a "significant item," Customer 7 kept a brokerage account with

Appelbaum and he continued to purchase unsuitable VRSPs in Customer 7's account.

51.     Ultimately, Appelbaum apologized to Customer 7's owner for purchasing the VRSPs for Customer 7 and asked for six months to "make it better."  Customer 7's owner severed her relationship with Appelbaum and filed a FINRA arbitration claim against him.[14]

52.     Appelbaum made similar false and misleading statements to other customers.  In or around May 2018, Customer 3's owner (who was in her mid-80s at the time) asked Appelbaum to provide the market value of all VRSPs that Appelbaum had purchased for Customer 3, as she had noted that those market values had significantly decreased from their "par" value.  Customer 3's owner conveyed her request to Appelbaum through her son. Appelbaum's assistant responded with the market value of the Customer 3's portfolio, which was heavily concentrated in VRSPs and showed significant losses.  Less than 10 minutes later, the son responded to Appelbaum that Customer 3's owner "directs that you stop trading until she's had a chance to review the account."  The following day, the son wrote an email to Appelbaum advising that Customer 3's owner had requested that Appelbaum "sell the structured notes and obtain the best achievable price."  Appelbaum responded by falsely stating that the $1.7 million owned by Customer 3, much of which was invested in VRSPs, "will appreciate to a par value of $2,044,000 at maturity."  But as Appelbaum knew, was reckless in not knowing, or should have known, the VRSPs that Customer 3 owned were not principal protected and thus were not guaranteed to "appreciate to a par value."  In testimony, Appelbaum admitted that he had made

---

[14] The FINRA arbitration against Appelbaum, which was settled through a $1.65 million payment to Customer 7, alleged that Appelbaum's VRSP trades were unauthorized and unsuitable, and that Appelbaum made material misstatements and omissions.

this statement based on "an assumption that the non-principal protected notes would also pay off even though they're not protected[.]"[15]

53.     Appelbaum made similar misrepresentations to Customers 1 and 2, trusts owned by a husband and wife both in their 80s.  The owners of Customers 1 and 2 told Appelbaum that they wanted to maximize income but did not want to lose principal.  Nonetheless, Appelbaum purchased over 20 VRSPs that were not guaranteed to repay any principal at maturity or any interest after an initial teaser period.  When Customers 1 and 2 confronted Appelbaum about losses in their account, Appelbaum falsely stated that the "value [Customer 1 and 2] see on the statements is not the real value" and told them that they should not worry about the principal loss on paper.  He concealed the material fact that the VRSPs might not repay any principal at maturity depending on the performance of certain stock market indexes.

**Appelbaum Engaged In Fraudulent Unauthorized Trading**

54.     All of the accounts managed by Appelbaum were non-discretionary, meaning that he was required to seek and obtain customer authorization prior to each and every transaction in those accounts.  As Appelbaum testified, "I've never opened a discretionary account . . . I don't have discretionary accounts."  Appelbaum further testified that he never even had "limited authorization" over any of his customers' accounts.

55.     Appelbaum knew that Aegis had a policy that prohibited unauthorized trading and that obtaining authorization before any trade was "the way you're supposed to do it."  As he testified, Aegis policy "requires [ ] that a broker speak to a client before putting an order in for that client" for any non-discretionary accounts, including all of his customers' accounts.

---

[15] As noted above, in 2021, Customer 3's owner filed a FINRA complaint against Appelbaum, alleging, among other things, that Appelbaum made material misrepresentations and unsuitable recommendations.

56.     Appelbaum further testified that "as a matter of practice" the authorization was "usually minutes to hours" before a trade, but that he believed that he had "a 24 hour window to be able to take an order and then fill it."  Appelbaum testified that he knew that he was required to obtain the following authorization from each of his customers 24 hours before a trade:

> Q.     What, if any, term of a trade does the broker need to obtain authorization for within the 24-hour window that you just mentioned?
>
> A.     Well, certainly the name of the security, all of its most important elements. In the case of - because I do almost all in bonds the interest rate, the maturity date, the price, the yield, if there's any call features, any yield to the call, all the pertinent facts necessary for a client to make a decision, which I, sort of, included, I think, most of them.
>
> Q.     Is it your understanding that a broker needs to obtain the quantity of securities traded?
>
> A.     Of course the -- yes. I left that out. Of course the quantity.

57.     Appelbaum testified that he typically obtained authorization from his customers through a phone call with the customers.  Appelbaum further testified that "I do almost all of my business over the phone," so customer authorizations would have been over the phone.  As a result, any customer authorizations that Appelbaum obtained would have been through a phone call between Appelbaum and each customer.

58.     Multiple customers have stated that Appelbaum did not obtain authorization before purchasing and selling VRSPs in their accounts.  Four customers (Customers 1, 2, 3, and 7) also filed FINRA complaints against Appelbaum for unauthorized trading and for trading using his own discretion in their accounts.

59.     An analysis of Appelbaum's personal cell phone record and a summary of phone calls provided by Aegis to the SEC, compared with the phone numbers of the seven customers,

shows hundreds of VRSP transactions in the customers' accounts from August 2015 through May 2019 where Appelbaum did not contact the customer to obtain authorization prior to the transaction.  The results of that analysis, which excludes any trades that were placed seven days or less before or after a phone call between Appelbaum and the customers, is attached as **Exhibit 2**.

60.     Appelbaum engaged in the unauthorized trading even though he knew, or was reckless in not knowing, that the practice was prohibited by law and by Aegis policy.  In those trades, Appelbaum purchased and sold VRSPs in the accounts of customers for whom VRSPs were unsuitable and to whom he had made material misrepresentations and omissions regarding VRSPs.

61.     On the vast majority of unauthorized trades set forth in Exhibit 2, Appelbaum earned compensation.

62.     Appelbaum admitted that he engaged in unauthorized trading in sworn testimony:

Q.     So there were sometimes where you did not g[e]t authorization before making a trade; is that correct?

A.     Look, I am sure through the years there were a few times that it happened. I can't say ever.  "Always" is a tough word to say. Okay?  So if you're going to put me in a box, **I'll say yes, I have done it**, but that was not my practice.

**This Action is Timely Filed**

63.      Appelbaum entered into agreements with the SEC in which he agreed to toll, for various periods and various lengths of time, any statute of limitations applicable to the conduct and claims alleged herein.  Defendant's tolling agreements cover the period between December 10, 2019 through July 30, 2021.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**

64.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 63, as if fully set forth herein.

65.     Defendant, directly or indirectly, singly or in concert, in the offer or sale of

securities and by the use of the means or instruments of transportation or communication in

interstate commerce or by use of the mails, has: (a) knowingly or recklessly employed devices,

schemes, or artifices to defraud; (b) knowingly, recklessly, or negligently obtained money or

property by means of untrue statements of a material fact or omissions of a material fact

necessary in order to make the statement made, in light of the circumstances under which they

were made, not misleading; and/or (c) knowingly, recklessly, or negligently engaged in

transactions, practices, or courses of business which operated or would operate as a fraud or

deceit upon purchasers of securities and upon other persons.

66.     By reason of the foregoing, the Defendant, directly or indirectly, singly or in

concert, has violated, and unless enjoined, will again violate Section 17(a) of the Securities Act

[15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**

67.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 63, as if fully set forth herein.

68.     Defendant, directly or indirectly, acting intentionally, knowingly or recklessly,

singly or in concert, in connection with the purchase or sale of securities and by the use of the

means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national

securities exchange, has: (a) employed devices, schemes, or artifices to defraud; (b) made untrue

statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

69.     By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated, and unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

## I.

Permanently enjoining the Defendant from committing, aiding and abetting, or otherwise engaging in conduct that would make him liable for the violations of the federal securities laws alleged in this Complaint.  *See* Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)]; Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

## II.

Ordering the Defendant to disgorge any ill-gotten gains and to pay prejudgment interest thereon.  *See* Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(5) and (d)(7)].

## III.

Ordering the Defendant to pay a civil monetary penalty.  *See* Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**IV.**

Granting such other and further relief as the Court may deem just and proper.

**<u>JURY DEMAND</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.


Dated:  July 28, 2022                                 Respectfully submitted,


                                                      <u>/s/ *James P. Connor*</u>
                                                      James P. Connor
                                                      Eugene N. Hansen
                                                      U.S. Securities and Exchange Commission
                                                      100 F Street, NE
                                                      Washington, DC 20549
                                                      Tel: (202) 551-8394
                                                      Email: connorja@sec.gov
                                                      *Attorneys for Plaintiff*


<u>Of counsel:</u>
Yuri B. Zelinsky
Anik A. Shah
100 F Street, NE
Washington, DC 20549